Memorandum of Decision
Atty. Stephen Vitalli for the Department of Children and Families ("DCF") Atty. Barbara Rossiter for the children. Atty. Deborah Mason for the mother, Kim G. Atty. Arthur Meisler for father, Jerry G. Atty. David Stone, GAL for the children
I. BACKGROUND.
A. The Parents
The parents of the children, the subject of this petition are Kim and Jerry G. They were married on June 28, 1986. They had two children issue of their marriage, Joshua, born August 10, 1987 and Alicia, born September 13, 1990. Prior to the marriage Jerry had been married for almost five years, from December, 1980 to May, 1985. Jerry accepts responsibility for the failure of that marriage, as he did not appreciate his first wife.(Petitioner's Exhibit # 1 p. 11) He was "totally wrapped up in himself" and he treated her badly. (Respondent Father's Exhibit A p. 27) Jerry testified that he became a Born Again Christian the same month he obtained his first divorce, May, 1985.
Prior to this marriage Kim had a child by an earlier relationship. The child, Michael, was born on June 9, 1981. He is now 16 years of age. He is the older half-sibling of Joshua and Alicia.
B. The Mother
Kim attended school only until the 11th grade. She reported CT Page 11583 problems in her home life and a lack of interest in school work. As a child she was not emotionally close to anyone in her family. She did not recall any pleasant memories of activities with her mother. Both of her parents were physically abusive to her, her father hitting her with a strap and her mother hit her and swore at her while drunk. At age 16 she began work in a factory and then worked as a nurse's aide. She does not use alcohol because of "what it did do her parents." She has recently worked as a home health aide and takes courses at a local community college. Kim reports that Michael's father was a man who had been in prison. Her first sexual experience was when she was "raped by Michael's father." He forced her to have sex during a date. She did not consider it rape at the time. The man was subsequently incarcerated again for an unrelated matter and he has not served in any manner of parental role for Michael.
Kim joined a Pentecostal Christian church in 1984 and soon met Jerry. She recalls that "things happened too quickly," and the they became physically involved almost right away. She reported to Dr. Ronald Anderson, the court appointed evaluator, that her physical involvement "ruined everything." Jerry gave her a ring while he was still married to his first wife. Kim gave it back until his divorce was final and they were then married very shortly thereafter. She now believes they married "on the rebound" and that she was too young. Kim was then 25; Jerry was 33.
Kim reported that Jerry was "always gone" and that he abused drugs and would "take off" when he was using them. She and Jerry both reported episodes of domestic violence. She reports that she often asked him to leave the home. They separated in October, 1993 and were involved in a bitter, protracted and contested divorce proceeding for three years. The final decree of dissolution of marriage was not granted until December 19, 1996.
 After he left the home, she had a relationship with a man, which ended when she became pregnant. Through her pastor, Kim arranged to travel to Missouri to have the child, and arrange for adoption with a Christian family. She delivered a son, whom she named Ethan. She left in mid-1995, and took Alicia with her. Her husband returned home to care for her two sons.(Michael and Joshua). However, her husband "couldn't take it." Her oldest son skipped school for eight days, and her husband CT Page 11584 was yelling and hitting the boys with a belt. She arranged to have her sons brought to Missouri for a visit, and then let them stay with her when they did not want to return. She had difficulty getting her husband to leave her home, and eventually she had the telephone shut off. On her return, she found the apartment "trashed," and pornographic magazines, video tapes and used condoms had been left behind. She suspected that he had purposely left the apartment in that condition, because he had been "violently angry" about her affair with Ethan's father. Psychological Evaluation P. 16
C. The Father
Jerry was the oldest of three children from an intact family. He reported essentially an uneventful youth. His mother used alcohol excessively, but he was closer to her than to his father. Jerry did particularly well in high school writing and was urged to continue to pursue that career. He obtained an associates degree from a junior college in communications. During his college and subsequent years he reported heavy use of alcohol resulting in frequent blackouts and loss of employment. In 1976, Jerry joined Alcoholics Anonymous. He was 24 years of age.
Jerry admits to his first use of alcohol at age 10 when he stole it from his uncle's house. By age 12 or 13 he regularly stole whiskey from his parents and drank in "a ritualistic" way. Even after joining AA he "bounced in and out of AA for a couple of years. He first used marijuana at age 17 and continued to use it for about 14 years.
Jerry told Dr. Anderson he began his first sexual experience at age 11 with a girl his own age. He continued to have "casual sex" for a couple of years, but it was not a particularly romantic relationship. His first marriage did not produce children and ended because even though he had stopped using alcohol, "his lifestyle didn't change and he still did whatever he wanted, with out regard for her feelings."
Jerry admits that his second marriage to Kim was "rocky" from the start. "This was largely due to his own sporadic binges with stimulant inhalers, but his wife also had problems controlling her temper." (Respondent Father's Exhibit A p. 27) Following their CT Page 11585 separation in October, 1993, Jerry professed to paying all the bills and said that Kim did not allow him to visit the children for more than a year until after Thanksgiving, 1994 when he instituted the divorce. He told Dr. Anderson that visitation was problematic. Each claimed the other to be in contempt of court ordered visitation and support. Those allegations continue post-dissolution.
At the time of Dr. Anderson's evaluation, November, 1996 to January, 1997, a forty year old women and her two teenage children were living with Jerry. They had lived in different states, she in Vermont, and had met through computerized transactions over the Internet. At the time, Jerry hoped to marry her although the relationship had been strained.
Within three months of that report, Jerry had met yet another younger women in March, 1997, through computer communications over the Internet. He met Kristie Hazelwood, a 26 year old special education tutor on his computer screen in an America On-Line ("AOL") Christian "chatroom." By April, 1997 this attractive young women with a bachelors degree in music and a "B.S. in Bible" had moved in with him. Jerry entered his third marriage with Kristie on July 19, 1997. There is no indication what happened to the former 40 year old girlfriend and her two teenage children.
In September, 1997 Jerry had lost his job as a national guard supply technician and had accepted employment in a position with a newspaper in Ohio. He and his new wife will be living in Ohio, if they are not already doing so.
II. THE DISCLOSURE
Into this cauldron of interpersonal distress, disappointed, contentious adults, children who have witnessed too much anger and received too little affection, came an event of unimaginable consequences. While the parents were grinding their way through the courts to unravel their marital strife, a problem surfaced during visitation.
Jerry was living in Middlesex[2] with his newest girlfriend and Kim was living with Michael, Joshua and Alicia in Windbury[3], probably with her present boyfriend. On Memorial Day week-end, May 26, 1996, Alicia, then 5 and 1/2, disclosed that her older brother Michael, then 14, had touched her "private CT Page 11586 parts" on two occasions while she was being bathed by her brother. It would be hard to imagine the layer of grief and despair that descended upon Alicia and this already stressed family by virtue of this disclosure. This was a deeply troubled and divided family with no extended family or support systems.
Instead of a firm, purposeful and quiet resolution of the case where the damage to Alicia was minimized and resolved and where Michael quickly received needed and appropriate therapy, both Alicia and Michael were victimized by their parents, subsequent conduct. It was as if Alicia had sustained a small surface abrasion, and in the name of medical treatment, personnel would in turns, probe and reopen the wound, each enlarging it until it was a great wound leaving a deep scar.
It is not clear what kind of questioning her father did to her in his apartment or whether she could overhear him calling the authorities. The next day, May 27, 1996, her mother appeared at the father's apartment to take Alicia and her brother back. Her mother and father fought about whether to release them from their father's week-end visit. The father, upon the urging of DCF, had wanted the children to extend their stay with him. To trump this move by Jerry, Kim called the police on Jerry to have him arrested on an outstanding warrant for a bad check charge. Alicia and Joshua were exposed to the arrest of their father before they returned home with Kim. Their father was arrested as a common criminal and their mother was furious with Alicia.
On the ride back to Windbury, Kim, who has monumental problems with anger management, was in a rage. She knew the significance of the disclosure. She knew Jerry would try to get custody of the children. She may have known that DCF would be involved. She could see her family dissolving before her very eyes. Kim had brought a fellow church-member with her to pick up the children from Jerry's apartment. This woman testified to the anger, screams and travail that filled the car on the way back to Windbury. Kim was yelling at Alicia to recant, that it wasn't true that Michael had touched her, that he was only washing her, that her father made her say such things. Alicia was crying and saying it did happen, that she wasn't lying, Joshua was crying and trying to get his mother to stop her yelling. Kim's fellow church member unsuccessfully tried to intervene, to settle things down. To no avail. Kim was a fury. Kim persisted in her yelling most of the way home. The ride home will likely remain vividly in the children's memory forever. CT Page 11587
May 28, 1996. The next day a DCF social worker and a police officer came to Kim's home. Kim was sitting on the couch with Alicia and Michael. Kim introduced the children as "This is Alicia and this is Michael, the one who is being falsely accused." What thoughts were going through the mind of 5 and 1/2 year old Alicia can only be imagined. Alicia only knew that whatever was happening, she had caused it and things were getting worse. The police detective asked them all to go down to DCF headquarters to discuss the matter. They offered to get Joshua, who was then at school.
Later that day Alicia began a process of interviews and questioning that has continued from Memorial Day week-end 1996 to her most recent evaluation by Dr Meier, November 4, 1997. Detective Wackerman and Kathleen Bator, the DCF social worker, probed and prompted little Alicia to tell them every small detail of her disclosure and the subsequent conduct of her parents. They asked her to draw pictures. They showed her anatomically correct dolls.
Alicia was reluctant to report but ultimately told them her story. After she returned from school, Michael had come home. Michael would then do his route. Sometimes the mother, Kim, would help Michael with his route. The mother then left Michael to babysit as she went to her work as an home health aide. A little later Joshua came home from school. During this "window" between Kim going to work and Joshua coming home from school, while "supervising" Alicia's bath, Michael touched her "private parts" and told Alicia not to tell mom. Shortly after Alicia told the policeman and the social worker this information, the police gave her mother, Kim, and her brother, Michael, their "Miranda" warnings.
A few years earlier Michael had been a victim of sexual abuse and had exhibited some sexually inappropriate behavior at a Christian Academy camp he was attending. Apparently Michael went three times to a Christian counselor, who was a member of church, following the episode. He was permitted to return to the Academy provided he did not go into the bathroom with other boys, according to his step-father. There was no further treatment and the matter was considered closed.
At the DCF office or at the police station, it is not clear, Kim, at the urging of DCF and the police, confronted Michael CT Page 11588 asking him why his sister would lie about something like that. The police detective had said that Kim was very cooperative with them Michael consistently denied touching her and stated that his step-father, Jerry, had put her up to that. "I'm going to kill him" Michael kept repeating. Kim continued, confronting Michael about "molesting" another boy at the Christian Academy years earlier. Michael became enraged and despondent screaming that he hated his mother, ". . . because the way you treat me and call me names."
Joshua, who was 8 1/2 years of age at the time, was interviewed at the Christian Academy school by a DCF worker. Joshua relayed the events of the week-end and the trip back home. He told the social worker that the police handcuffed his father and took him away in a police car. Joshua reported that when they got home his mother was yelling at Alicia and Michael. In response to the many probing questions, Joshua said that Michael had touched him in his private parts one time when he was four year old. Joshua appeared very uncomfortable during the interview. He said he never told his mother about the incident.
DCF invoked a 96 hour hold on Alicia. DCF removed Alicia from the home and brought her to live in a foster home. Kim was glad that the child was going to a foster home rather than going to her father's home. She made a point of telling Joshua "They're taking her away." It is not clear why DCF did not consider the father, who had court-ordered visitation rights, as a suitable person to protect Alicia. Work began immediately on the arrest warrant for Michael.
Within the week Kimberly Herwerth of a local sexual abuse crisis center was engaged by DCF to further interview Alicia and Joshua. During an interview in which Joshua was present, Alicia tried to recant her story. Five and a half year old Alicia insisted she was just joking and that "He didn't even give me a bath." To which Joshua replied, "Alicia, you know that's not true, I saw that you were in the bath tub!"
Alicia, following her interviews with her father, the social worker Kathleen Bator, the police detective, and the sexual abuse crisis worker Kimberly Herwerth, has since been interviewed by at least six, perhaps eight, other well-intentioned people including DCF treatment workers; a "family therapist"of the mother; Alicia's own therapist at United Services; a therapist engaged by the father in Waterford; Dr Ronald Anderson who spent "nearly CT Page 11589 forty hours" in his evaluation, perhaps her attorney and perhaps her Guardian Ad Litem, and assuredly, by Dr. Robert Meier, who has most recently evaluated the family.
Alicia has been removed from her own home to foster care. She has not been permitted to see her brother Michael in over a year and a half She has been returned to her mother; removed from her mother and placed with her father; and, pending this trial removed from her father and returned to her mother. Her brother Michael has been committed to DCF, removed from the home and been placed in an institution. He has been arrested and charged with Risk of Injury to a Minor and Sexual Assault in the fourth degree. The parents continue to wage relentless war over the children's placement. Alicia and her brother Joshua to this day are uncertain of where they will rest their heads each night.
Michael is a victim himself of a tragic union. He has been raised without a biological male parent, living with a distant, stern, foreboding step-father and an out-of-control, screaming, swearing mother in a dysfunctional home, the victim of sexual abuse himself. The court inquired of the sexual abuse expert, "How do you distinguish between innocent normal sexual exploration or inquisitiveness and sexual abuse?" She said it was the age, Alicia was 5 and 1/2 and Michael was 14 years old. The step-father, Jerry, testified that while Michael was in out of the home placement in 1996, he had made "a $100 worth of phone calls to a `gay sex' phone line." The personal therapist for Kim at United Services testified in response to a question by the court that she and Kim have explored the issues around Michael possibly being gay.
Dr. Anderson was most concerned about Michael's problem. He concluded that Michael had a long-standing sexual impulse control problem secondary to having been sexually molested himself "By refusing to recognize the problem, Kim has made it even more difficult for Michael to accept responsibility for his actions, and to get the treatment he needs. Sexual impulse problems are impulsive and highly repetitive, and he should not reside with younger children at this time." Kim's denials have prevented Michael from dealing with his problem and prevented Alicia from trusting her own feelings and developing a positive self-esteem.
But whether "gay" or "straight," whatever Michael's sexual demons might be, Michael is a confused adolescent who is alone, without his mother and prohibited from contact with his brother CT Page 11590 and sister. Dr. Meier said "[t]here are indications that impulses associated with body maturation and sexuality may be troublesome for him . . . His lack of self-worth and self-esteem are central problems for Michael." Dr Anderson reported that Alicia feels responsible for Michael's absence from the home.
DCF initially attempted to obtain Orders of Temporary Custody on Alicia and Joshua to remove them both from the home and place them both in foster care. On May 31, 1996, the judge denied DCF's efforts and set a hearing on an order to show cause. (Potter, J.) Following that hearing, the court removed Alicia from foster care and permitted the children to remain in the home of the mother, with the understanding that Michael would live with neighbors and not be residing in the home.
III. THE EVALUATIONS:
The court finds that the mother of these children bears more than a small measure of responsibility for Alicia and Michael's problems. Kim has steadfastly supported Michael's denials. She believes that she is protecting Michael, but as noted by Dr. Anderson she is seriously jeopardizing his future. A second evaluator, Dr. Robert Meier, said "she has a strong need to protect all her children." This single fact, her persistent denial of Michael's sexually inappropriate conduct, coupled with her immeasurable reservoir of hostility toward her former husband, have created the central problems which have caused Michael to be institutionalized and Alicia to be sent to foster care.
Dr Anderson described Kim's emotional problems as significant. She lacked coping resources and she was in total denial with respect to Michael' conduct and she has relatively rigid defenses. She was emotionally dependant on Michael and consequently refused to credit reports of his sexually acting out. Her interventions with the children lacked structure and she then relied on yelling and spanking to discipline the children. She was described as having significant impairment to her already limited parenting skills as a result of being besieged by social service workers. These parenting and emotional limitations were aggravated by her narrow focus in life on her struggle with her ex-husband. In summary, Kim's emotional problems and limited coping resources result in a significant impairment of her already rather weak parental judgment and skills. CT Page 11591
A clinical social worker from United Services testified that she has been seeing Kim for about a year now. She described the many stressors on Kim. She is under-educated, with a poor support system, she has financial problems, she has been in a bitter custody battle after a bitter divorce and is grieving the loss of the child she gave away to adoption. Her parents were alcoholics and she has a history of domestic violence. She suffers from depression for which she is being medically treated with Wellbutrin, an anti-depressant medication.
Initially Kim was in denial; she viewed this all as a sadistic, revengeful attempt by her ex-husband to gain custody of the children. The social worker-therapist said that today Kim is much more uncertain (about the events) and open to possibilities, but is still confused about what had happened. The therapist said that Kim consistently attends her therapy sessions, she brings the children regularly to their therapy, she is highly motivated to change and she is becoming more insightful. "She is very concerned that she is not the perfect mother."
It is not certain that Kim even now, understands the devastating impact that her failure to believe Alicia has caused to Alicia's fragile sense of well-being. Dr. Anderson in his evaluation of Alicia found her to be preoccupied by the morbid; she repeatedly mentioned dying and, in a drawing, ". . . a main character was going to sit and then fall into the deadness." A woman in one picture drawn by Alicia was sad and no one could cheer her up. Dr. Anderson diagnosed Alicia as depressed with morbid thinking. He testified that Alicia had now accepted her mother's account of things, namely that she, Alicia, had told a lie at her father's direction. Dr. Anderson explained that the child is learning to distrust her own feelings, and that her own internal feelings are bad. This will lead to a long term lack of self esteem and self worth. So long as the mother does not acknowledge the child's true feelings, Alicia is likely to suffer emotionally and to have feelings of low self esteem.
Alicia, as with most children, according to Dr. Anderson, was very reactive to mother's last pregnancy. Alicia identified in a care-taker role and did not have a complete understanding why the infant had been given away. Dr. Anderson said that Alicia's own security has been undermined by the thought that she might be given away. Her mother's harsh condemnation of Alicia's disclosure has only reinforced Alicia's fear of rejection by her mother. CT Page 11592
Dr. Anderson evaluated the father as well. Both the court and Dr. Anderson immediately noted that the father has extremely odd facial expressions and facial distortions that were very confusing to children and adults alike. Dr. Anderson stated that Jerry did not seem to be aware of his confusing manner and the way his mannerisms affected others. The court notes that during the testimony of others, the father's facial expressions varied from a bizarre, open mouthed, quizical stare, to pathos and, at times, to rage. Dr. Anderson described one of his frequent expressions, which the court also observed, as a nearly constant grimace-like grin. Neither Dr. Anderson nor the court believed that Jerry was aware of his confusing, but authoritarian manner of presentation. Dr. Anderson found that Jerry had issues with his anger, the way he expressed his anger, his authoritarian expressions, his excessively loud vocal tones and that he did not have a good grasp of rewards as an incentive for good behavior. He was found to be punitive, he had difficulty with warmth and affection, and again, that his mannerisms were confusing and authoritative to others. His tone of voice is often extremely, and inappropriately, loud, impatient and barking. His bearing and mannerism probably did not present problems at work, where he was employed as an army sergeant, at that time. Nonetheless, Dr. Anderson thought that the father was "more restorable" to the parental role than was mother. Dr. Anderson thought the children were at greater risk with the mother than with the father. He concluded his extensive report by recommending custody with the father.
Nearly a year passed. Dr. Robert Meier was asked to do an evaluation of the family. The children had been with the mother for most of that time, although they had been living with the father for a few months before Michael was institutionalized. Dr. Meier interviewed Alicia:
 "Alicia then gave a rather confusing explanation that at first she said she did not lie, then admitted she did. This was followed by a statement that now she lies a lot." "The child (Alicia) said her father told her to lie, because he wanted to get her mother in trouble." (Dr. Meier's November, 1997 report, Respondents Fathers Exhibit #B ).
Joshua was eight at the time of the disclosure. He had observed Michael in the bathroom with Alicia in the tub. He knows CT Page 11593 what he knows. He knows on some level his mother was rejecting him and not believing his sister. He had a strong identification with his brother Michael. He knows his father is now gone, his brother is now gone and he is unable to have contact with him. He has seen his sister removed from the home to foster care, his father arrested, his brother institutionalized and his mother unable to cope. He knows that there is something going on in court that will determine where he will live.
Joshua's mother tended to rebuff him during the evaluation by Dr. Anderson. He needs some assurance that she is not going to rebuff him in the future, according to Dr. Anderson. This whole juvenile court/DCF struggle has left Joshua and Alicia in a state of uncertainty about who they will live with and whether they will ever see their brother Michael again.
Joshua attempted to appear to be strong during his evaluation, in the face of painful feelings, feelings of inadequacy, loneliness, and resignation to his problems. His testing suggested underlying depression, marked by feelings of boredom, sadness and anger. Joshua appeared to feel both connected to his father and cut off from him. Joshua did not feel that things would get better and seemed resigned to feeling of sadness. Dr Anderson recommended that each child should have a therapist who was private to them and who had no shared loyalties with the mother.
Dr Meier's report which is far less exhaustive than Dr. Anderson's, but more current, assessed the present psychological status of the mother, Michael, Alicia and Joshua. Jerry was not evaluated due to the fact that he has now accepted employment in Ohio as a newspaper reporter covering local governmental matters. The day of the family evaluation was November 4, 1997, the day of local elections in Ohio. Jerry was unavoidably unable to attend the evaluation. It is noted that Jerry had numerous scheduling conflicts with Dr. Anderson as well.
Dr. Meier testified that the children seemed very contented living with their mother. Michael and the other children were distressed by their separation. Under the circumstance of their separation, division, and present uncertainty of permanent placement, the family seemed within normal psychological limits. Dr. Meier recommended that the children remain with the mother under Protective Supervision by DCF with intensive services including individual therapy for the children, individual therapy CT Page 11594 with psychiatric monitoring for the mother, and continued therapy for Michael. It is odd that although Dr. Meier did not make any highly unusual or negative findings regarding Michael in his evaluation, he recommended ". . . guidelines regarding no contact between Michael and the two younger siblings, mothers role with Michael and any other expectations deemed necessary by DCF."
DCF has alternately recommended the children live with their father, following the comprehensive evaluation by Dr. Anderson, and lately, that they live with their mother, following the more current recommendation of Dr. Meier. Dr. Anderson, who read the recent evaluation of Dr. Meier, was not persuaded that things have changed much.
The children's attorney, who has skillfully represented the children, called the Guardian Ad Litem as a witness, and concludes the children's case by arguing that the weight of the evidence in this very vexing case, suggests placement with the father and his new wife.
IV. THE LEGAL PROCEEDINGS:
Based upon these factual underpinnings, the petitioner, DCF, on May 31, 1996, filed a neglect petition with the Superior Court for Juvenile Matters asking the court to find that Alicia has been neglected and sexually abused and that Joshua has been a neglected child. Initially, Jerry declined to enter any plea at all to the petition, maintaining, upon advice of counsel, that the allegations of the petition are all directed at the mother and not at him. One allegation of the petition is that the children are being denied proper care and attention, emotionally and morally. In the "to wit:" portion of the petition, paragraph 7 reads:
 "On 5-29-96 Jerry G., father of Alicia and Joshua, stated to Department of Children and Families Social Worker Kathleen Bator that there is a history of domestic violence between himself and his wife, Kim G. He also stated that he has a criminal history which includes arrests for domestic violence, shoplifting, public drunkenness, Disorderly Conduct."
During his testimony, Jerry all but admitted, that he had neglected his children through his use of stimulant inhalers, his CT Page 11595 absence from the home, his lack of warmth, his harsh disciplinary techniques including strapping the boys with a belt, and the fact that his children were witnesses to the parents' domestic violence. The father believes he has resolved these issues through his subsequent therapy and parenting-skills classes.
Additionally, the father's use of pornographic materials, even if they were only inadvertently seen by the children, may be viewed by many within his religious group, and the court as well, as an impoverished moral situation for a parent. Indeed, his multitude of relationships, during and after his marriage, his use of a singles hot-line, the used condoms left in his estranged wife's apartment, all suggest a sexual preoccupation by Jerry that reflect on his proper moral care of his children.
Jerry offered testimony that after his separation from the family in October, 1993, he did not have visits with the children until a year later when an action was brought for a dissolution of marriage after Thanksgiving, 1994. Jerry seemed quite content to pursue his other interests and to not visit his children. He simply blamed Kim for the situation. His failure to visit his children for a year, is alone, sufficient to support a finding that he had failed to provide proper care and attention to his children.
Having heard the proffered testimony, including his own testimony, the court directed his counsel to enter a plea to the petition. Jerry entered a plea of denial. Kim had previously entered a plea of nolo contendere.
The court finds by a fair preponderance of the evidence that Alicia and Joshua were neglected children in that they had been denied proper care and attention emotionally and morally by both parents. As a supporting fact, and not as a ground, the court finds that Alicia was exposed to sexually inappropriate treatment by Michael. This fact does not make Michael a bad person. He did something that was wrong and should have been immediately evaluated and treated to deal with the issue.
While Jerry may have considered this to be basically Kim's problem, the court specifically finds that Kim was not a neglectful parent due solely to the fact that Michael improperly touched his sister. Kim was doing the best she could under stressful circumstances to care for her children and support the household. Jerry, in some measure, contributed to the difficult CT Page 11596 circumstances in which Kim and the children found themselves. She could hardly be declared neglectful under the circumstances. She was a working, single parent with limited emotional and parental resources, doing the best she could.
Kim's conduct following the disclosure was, however, extremely troublesome and did constitute a denial to both Michael and Alicia, of proper care and attention. Her inability to deal with the problem calmly and honestly has caused immeasurable emotional harm to all of her children. All three children have been greatly harmed by her conduct and attitude. Their memories of childhood will have scars that, no doubt, will haunt them forever.
But children are resilient and the mother is trying. Dr Meier recommends that no change in their status occur. The court concludes that further coercive intervention in this family would not be helpful or appropriate at this time.
ORDER
The children Alicia and Joshua are adjudicated to be neglected children. The court concludes that the choices for placement of the children are not good. None of the professionals, nor the attorney for the children nor the Guardian Ad Litem promote foster care as a solution. Jerry's new marriage and new job out of state present too many uncertainties and a dramatic change for the children. The mother has very serious and troubling limitations. Her steadfast denial of Michael's conduct is a pervasive and invidious problem. Only Dr. Meier's recent report that the children are functioning within acceptable psychological limits, and mother's therapist' reports that Kim is motivated and regularly attending therapy tip the scale sufficiently in her direction to allow the children to remain in their present setting under supervision. The court concludes that for the moment, it is the least detrimental alternative.
Pursuant to General Statute § 46b-129 the children's care and personal custody is vested in their mother Kim under Protective Supervision for a period of 12 months. The following expectations are set by the court:
A. Visitation is to be arranged by agreement of the parties, or if they are unable to agree, as may be ordered by modification of the parents' decree of dissolution of marriage. A copy of this CT Page 11597 decision shall be provided to any court reviewing the issue of the children's custody and/or visitation. This court specifically finds that visitation is appropriate and in the best interests of the children at this time. The court recommends, but does not order, visitation in Ohio after Christmas for six days and five nights, as well as extended summer visitation at the father's home. Transportation should be paid entirely by the father and visitation should be conditional upon his faithful payment of his court ordered child support obligations.
B. Michael should be reunited with his brother and sister as soon as therapeutically warranted. Kim must understand, that Michael is not to return to the household until she recognizes and affirms that Michael has acted in a sexually inappropriate manner on a number of occasions. Only then will Alicia be freed of her great burden and Michael will be able to begin the process of treatment and recovery. Under therapeutically approved supervision, Michael should immediately have visits with his mother and his siblings. Kim should understand that Michael may still pose a threat to other children until she and he accept that he has a problem and he undergoes therapy.
C. Kim is required to cooperate with DCF social workers to allow for home visits and conferences with the children as necessary.
D. Mother is to execute written releases to allow DCF to monitor progress and attendance at therapy and school.
E. Mother and children are to continue their current course of intensive therapy and follow the recommendations of the therapists. A copy of this decision and of Dr. Anderson's report are to be released to mother's therapist and to the children's therapist. It is very important that the therapists know of Dr. Anderson's findings. Portions of that report that deal exclusively with Jerry are to be removed from the report to the mother's therapist.
BY THE COURT
FOLEY, J